WILLIE BENSON v. THE STATE.

No. 3422.   Decided April 24, 1907.

**1.—Murder in First Degree—Continuance—Bill of Exceptions—Impeaching Testimony.**

A motion for new trial is not ordinarily granted on account of the absence of impeaching testimony set out in the motion for continuance. Besides the appellate court will not look through a stenographic report or a record, where the exceptions are scattered over a number of pages and not taken in such condensed and logical shape as to intelligently present the evidence excepted to and the ground for objection thereto; separate bills of exception to the rejection or admission of testimony are always preferable.

**2.—Same—Cross-Examination—Discretion of Court—Bills of Exception—Inquest Proceedings.**

Testimony taken at an inquest could be offered by the State to contradict its own witness only where the witness testified to some affirmative fact against the State and to its surprise; but where the bill of exceptions did not present

this matter to the appellate court in such shape as to be reviewed the same could not be considered. The right to cross-examine or to ask leading questions of one's own witness is a matter within the discretion of the court, when the witness is hostile.

### 3.—Same—Evidence—Leading Question.

Where upon trial for murder the State objected to certain questions by the defendant to the witness, as to what direction deceased took when he was shot, as leading, but the desired answer was made by the witness and admitted, there was no error.

### 4.—Same—Evidence—Cross-Examination—Conclusion of Witnesses.

Upon trial for murder, there was no error to permit the State to cross-examine defendant's witness and ask him if others were present and could have seen or did see a knife.

### 5.—Same—Reiteration of Testimony—Discretion of Court.

Upon trial for murder, it was entirely competent for the court to put a limit to the examination of a witness and prevent counsel from having him repeat his testimony.

### 6.—Same—Colloquy Between Counsel and Court.

Where upon trial for murder a colloquy between counsel and the court ensued as to whether questions propounded by the defendant's counsel were leading and which did not affect the rights of defendant, there was no error.

### 7.—Same—Charge of Court—Express Malice—Strangers—No Previous Grudge.

Upon a trial for murder, where the evidence showed that the parties were strangers and there was no previous grudge, a question of time in which a formed design to kill was formed was a factor in forming the intent, and the court correctly charged in defining express malice that no definite space of time was necessary to intervene between the formed design to kill and the actual killing, and that a single moment was sufficient.

### 8.—Same—Self-Defense—Charge of Court—Character of Deceased—Actual Attack.

Where upon trial for murder, there was no evidence of the character and disposition on the part of the deceased known to appellant, and there was evidence that deceased may not from defendant's standpoint have been in the very act of making an attack on him, it was error in the court's charge on self-defense to charge on the character and disposition of the deceased, and to base the charge alone on an actual attack by deceased on defendant, instead of also of an attack about to be made.

### 9.—Same—Self-Defense—Charge of Court—Knife Found After Trial—Practice on Appeal—Newly Discovered Evidence.

After an appeal has been perfected to the Court of Criminal Appeals, the transcript can only contain what transpired during the trial and subsequent thereto in connection with the case during the term of the court and until the appeal is finally perfected thereafter, and although important evidence may have been discovered subsequent to the adjournment of court, there is no method by which the same can be gotten into the record as an integral part of the case to be considered on appeal; and the fact that subsequent to the affirmance of the appeal, a knife, alleged to have been that of deceased, was found could not be considered.

### 10.—Same—Charge of Court—Weight of Testimony—Singling Out Fact.

Upon trial for murder, where the State had attempted to impeach its own witness on the ground of surprise, it was error on the part of the court's charge to undertake to tell the jury the character of the contradictory statement of the witnesses, and to point out testimony showing that said witnesses had failed to testify at the inquest trial that deceased turned and advanced toward the defendant at the time of the shooting.   Brooks, Judge, dissenting.

Appeal from the District Court of Bexar.   Tried below before the Hon. Edward Dwyer.

Appeal from a conviction of murder in the first degree; penalty, death.

The opinion states the case.

*W. N. Camp* and *C. H. Terrell,* for appellant.—In order for the district attorney to be allowed to claim surprise and propound leading questions he must act in good faith, and the evidence must show that he so acted.

The court has no power nor right to discredit any part of the testimony of any witness for the credibility of a witness is a question for the jury.  Bennett v. State, 24 Texas Crim. App., 73; Scott v. State, 20 S. W. Rep., 549; White v. State, 10 Texas Crim. App., 381; Adams v. State, 34 Fla., 185; Book V, Notes on Texas Reps., 428.  On question of admitting conclusions of witness:  Cooper v. State, 23 Texas, 331.  On question of express malice as defined in court's charge: Stuckey v. State, 7 Texas Crim. App., 174.

In this case the proof absolutely shows by all the witnesses both for the State and the defendant that the defendant and the deceased were absolute strangers, and had never seen each other until five or ten minutes before the killing actually occurred, and therefore it was impossible for the defendant to have any knowledge of the character and disposition of the deceased.  All evidence tending to show self-defense was to the effect that the deceased was making an attack or preparing to make an attack, and had advanced one or two steps towards the defendant, and not by a single witness is it even intimated that he had actually made an attack on the defendant.  Hickey v. State, 76 S. W. Rep., 921; Wallace v. State, 97 S. W. Rep., 471; Brady v. State, 65 S. W. Rep., 521; Phipps v. State, 31 S. W. Rep., 397; Stewart v. State, 15 Texas Crim. App., 598; Gardner v. State, 11 Texas Crim. App., 265; Gentry v. State, 24 Texas Crim. App., 80; Chamberlain v. State, 25 Texas Crim. App., 398; Tracy v. State, 27 Texas Crim. App., 496; White v. State, 28 Texas Crim. App., 71; Jackson v. State, 28 Texas Crim. App., 143; Bow v. State, 31 S. W. Rep., 170; Tuller v. State, 8 Texas Crim. App., 501; Conn v. State, 11 Texas Crim. App., 390; Bishop v. State, 43 Texas, 390; Johnson v. State, 13 Texas Crim. App., 378; Lynch v. State, 24 Texas Crim. App., 350; Varnell v. State, 26 Texas Crim. App., 56.  Where the court in his charge singles out a special issue, it is a charge upon the weight of the evidence and constitutes error.  Bryant v. State, 16 Texas Crim. App., 144; Ball v. State, 36 S. W. Rep., 448.

In case this court should believe it has not the jurisdiction to consider this (newly discovered) testimony, we then ask that this court hold this case in its present condition, without ruling on this motion for a rehearing, and allow us to withdraw the affidavits filed herein and present them to the district judge of the 37th Judicial District upon a motion for a new trial upon the ground of newly discovered evidence. This latter procedure was adopted in the following cases:  State v.

Turner, 17 S. E. Rep., 752; State v. Way, 18 S. E. Rep., 677; State v. Young, 14 S. E. Rep., 66; State v. Sullivan, 19 S. E. Rep., 722. In these cases the court of last resort has jurisdiction only over questions of law, and for this reason they state in their opinions that they could not consider this testimony, but they refuse to deprive the appellant of his rights and allow him to go into the lower courts as above stated. In this State the courts of last resort have jurisdiction over questions both of law and fact, and we believe that it is quite clear that this court will not deprive the appellant of any right and will consider this testimony exactly as a trial court would consider it upon a motion for a new trial.

*F. J. McCord,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at death, from which judgment he prosecutes this appeal.

Briefly stated, the circumstances show that appellant and deceased were negroes, and on the night in question, which was about the 4th of September, 1906, both had gone out to one of the parks in San Antonio, and were returning to the city on the street car. Before taking the car and while still at the park, a wordy altercation occurred between appellant and a negro woman who was in the company of deceased. After all the parties got on the car this quarrel was resumed. The testimony of the State's witnesses tends to show that appellant was the aggressor, and was insulting in his remarks to the sister-in-law of the deceased. Deceased, while the quarrel was going on, came from the rear toward the front of the car where appellant and his sister-in-law were and interfered; he told appellant in substance that he should not insult his sister-in-law, at which appellant abused him and told him he would see him (deceased) later; that when the car arrived down town all the parties got off; in getting off appellant shoved the sister-in-law of deceased off the step, and as soon as he got off denounced the deceased and drew his pistol and shot three times; at the first shot deceased fell, and then appellant fired two other shots in rapid succession.

Appellant's testimony tended to show that in the first quarrel between appellant and deceased's sister-in-law, the woman was the aggressor in the quarrel and that deceased interfered with a knife in his hand and threatened appellant; told him in effect if he wanted anything to get off the car then and settle it. When they got to the point where the parties alighted from the car, after they started off, deceased turned and walked back towards appellant a few steps; appellant, who was standing on the sidewalk, apprehending danger, from an attack by deceased, shot him. This is a sufficient statement of the case in order to discuss the assignments of error.

We do not deem it necessary to discuss the assignment of appellant

with reference to the stenographic report of the testimony in the case. If it be conceded that appellant had a right to have the stenographic report, we do not see that he suffered any injury so far as the preparation of the motion for a new trial is concerned, as it appears to have been prepared carefully and covering all the necessary points.

We do not believe that the court erred in overruling the motion for a new trial based on the act of the court in regard to overruling the motion for continuance. The State's witness Jefferson, it appears, on cross-examination, stated in answer to a question by appellant, that he did not take a knife off of the body of the deceased, and appellant says he wanted the witness Powers in order to prove by him that Jefferson told him that he did take a knife off of the deceased. This, at most, would be merely impeaching testimony, and a motion for a new trial is not ordinarily granted on account of the absence of such testimony. Besides, we fail to find in the record any bill of exceptions to the action of the court in overruling the motion for a new trial. In this connection, we notice on page 327 of the stenographer's report what is entitled appellant's bill of exceptions number 10. It appears counsel for defendant made a statement to the court that before announcing ready for trial he had a motion for continuance in his pocket, on the ground of the absence of Will Powers, and he told Mr. Baker he would present it, and that Mr. Baker agreed to admit the testimony which would be if he was here, so counsel for defendant understood, "that Robert Jefferson told him he took the knife off of the body of the dead man at that time." Mr. Baker agreed to admit that. The court: "The court didn't know anything about." Mr. Baker: "I said, there is no use admitting anything, because he was a fugitive from justice." The court: "And I understood you to say, if you could only get Arthur Parrish you would go to trial, and there was no understanding, whatever, and I told you if you didn't get Parrish you could withdraw your announcement of ready for trial, and I would entertain your motion." Mr. Terrell: "We want to impeach Jefferson's testimony, and asked him if he didn't take the knife off the body of the dead man at that time. And we have here the motion for continuance." The court: "I can't help that." Mr. Terrell: "We will ask time for writing another motion for continuance." The court: "You can consider it as in, and I will overrule it." Mr. Baker: "Deputy Sheriff Goforth informs me he remembers the conversation and that he remembers that I would not admit the testimony of Will Powers." The court: "It must have been a misapprehension. You didn't state what the testimony was to me at all, and, gentlemen, you will consider the motion refused, to withdraw your announcement, and all I said here is my reason for not granting it." Now, we cannot make out of this a motion for continuance and the overruling of same. Indeed, we would furthermore make this observation with reference to a number of bills of exception taken to testimony introduced or rejected. The exceptions taken in the stenographer's report appear to be in the shape

of questions and answers, and at least a number of exceptions are in such a confused state as to leave it doubtful as to the nature of the exception. We have heretofore stated that we would not look through a record where the exceptions are scattered over a number of pages and not taken in such condensed and logical shape as to intelligently present the evidence excepted to and the ground for objection to same; and such we find to be the condition as to some of the exceptions claimed to have been taken in this record. It is decidedly the better practice to take separate bills of exception to the rejection or admission of testimony, or if these exceptions are taken in the statement of facts they must be in such condensed and logical form as to present in an intelligent way the error complained of. See Stephens v. State, 15 Texas Ct. Rep., 937.

We note the action of the court with reference to the cross-examination of the witness Sarah Jones is assigned as error. It is insisted that this witness was a State's witness, and that the court permitted the district attorney to cross-examine her on the alleged ground of surprise on the part of the district attorney at her testimony. On pages 167–8 of the stenographer's report this matter is presented, and it appears therefrom that the court permitted the district attorney to cross-examine said witness, and following this it appears the district attorney asked the witness some questions which may be considered in the nature of a cross-examination of said witness, but it is difficult to eliminate or determine what are and what are not leading questions. The right to cross-examine or to ask leading questions of one's own witness is a matter within the discretion of the court when it appears the witness is hostile to the party calling such witness. The bill should show enough of the environments to point out the error of the court, and we do not believe this bill does so. In this connection we note that some exception was taken to the introduction of the inquest testimony of this witness, or at least using this inquest testimony by the State in the examination of said witness. Counsel for defendant objected, it seems, to further examination of the witness by the district attorney, claiming that there was no variance in the testimony of the witness at this trial and the testimony as contained in the statement of the witness at the inquest trial. The court stated, "But the district attorney is going on the theory that she did not testify to these other things at the inquest," and appellant excepted to this. The quesion was then asked "Why didn't you tell what you saw," to which witness replied: "I told you what you asked me, and if you had asked me if I saw Miller in any position, I would have told you," and then other questions and answers followed. Now, it is impossible to determine what was excepted to or how the exception was made or taken. In this connection we note that counsel for defendant objected to the introduction of certain inquest statements, on the ground that the witnesses whom the State endeavored to impeach were not asked the same questions in the inquest proceedings by the district at-

torney as they were asked upon this trial, and, further, because the statements as testified to at the inquest proceedings had not been denied under oath by any one. This appears to apply to the inquest testimony of several witnesses, including Sarah Jones. We are not informed what questions were asked by the district attorney, and we do not know whether a predicate was laid for impeachment or not: nor are we informed what oath was referred to when it was said the testimony at the inquest proceedings had not been denied under oath by any one. Matters of this character should be definitely pointed out so that this court may know what it is expected to review or revise. Inquest proceedings can be referred to and used under certain conditions. Witnesses may be impeached by such testimony under certain conditions, and if those conditions do not exist, which authorize the use of this testimony, bills of exception must definitely and intelligently point out the matter complained of and why it was complained of. . We notice in appellant's brief it is stated: "A close perusal of the testimony at the trial, and the proceedings at the inquest, will show that the only difference between the testimony at the two different times, was that upon the trial all the details were brought out, and of course many minor points were brought out which were not brought out at the inquest, and which naturally would not have been brought out, because the inquest was not for the purpose of going into all the details of the killing, but only to fix the cause of death." If this be true, it appears to be a proper deduction, while it does not present any question for our consideration or afford any reason why the inquest testimony could not be offered. Such testimony could be offered by the State to contradict its own witness only where the witness testified to some affirmative fact against the State and to its surprise, or such testimony might be appealed to by the State to contradict a witness for the defendant under certain circumstances, but as far as we are advised from these bills of exception the matter is not presented to us in such shape as to be reviewed.

On page 264 of the stenographer's report we notice a colloquy between counsel for the State and defendant and the court. The objection was made by the district attorney that in the examination of the witness Mary Lou Courtney by appellant the questions asked her were leading and the court held that appellant could prove by the witness the direction deceased was going with reference to appellant at the time he was shot, but not to ask leading questions. While some questions were excluded on objection, we notice that appellant proved by the witness what he had a right to prove: the direction that deceased took or was taking at the time he was shot. We notice that the question asked to elicit this was leading, as follows: "Before the shooting, was he coming towards you when you first noticed him?" A. "He got off the car and went back of the car, when he made two steps, about one or two steps towards us," and subsequently she answered "When he got off, it threw him back of the car, and he went

around and then made two steps toward us, but I don't know what motions he made." So there does not occur to us anything in this bill of exceptions.

It does not appear to us that there is anything in appellant's bill of exceptions number 9, on page 314 of the stenographer's report.

In the examination of Arthur Parrish, a witness for the defendant, the question was asked by the State on cross-examination: "Don't you think there were a dozen there with eyes enough to see that knife? Mr. Camp: We objected to that. He is endeavoring to draw conclusions. Let him state the facts. Q. Don't you know if there was any knife in his hand there a dozen people could have seen it? Mr. Camp: We object to that, it calls for a conclusion of the witness. The district attorney is holding me down rigidly. The court: This is cross-examination, gentlemen. Mr. Camp: We will take a bill of exceptions, your honor." Now, it does not appear from this that even if it was conclusion of the witness as insisted on that the matter was prosecuted or any conclusion developed. Of course, we take it in cross-examination a witness could be asked who else was present at the time, and if others were present, if they could have seen or did see a knife.

On page No. 346 of the stenographer's report appellant has his exception No. 11, in which it seems that appellant took objection because he was not permitted to have a witness reiterate his testimony. We think it is entirely competent for the court to put a limit to the examination of a witness and to prevent counsel from having him repeat again and again his testimony.

On page 374 of the stenographer's report, we find exception No. 12, which appears to be to a ruling of the court on objection of the district attorney against appellant's counsel asking leading questions: "Q. Were you still excited when you fired those three shots? A. Yes. sir. Q. And were you more excited at the second shot? The court: I don't think you have a right to lead. Counsel objected to your leading. Don't lead your witness. Let him state his frame of mind. Mr. Terrell: I would say to the court there had been no objection raised at that time to the question and stenographer's report will show it, and I except to the court's remarks. The court: I understood the district attorney to object. Mr. Baker: I objected, and I want to ask counsel not to lead the witness whether I object or not. The court: If he desires you to object, it is his privilege. Mr. Baker: I will make a standing objection. Mr. Terrell: I take exception to the remarks of the court, that the counsel for defendant seemed to be determined to have their way. The court: That's your own gratuitous remark, I never said anything of the kind, sir. Mr. Terrell: We take exception to that." Of course, there is nothing in this colloquy of an erroneous character so far as appellant is concerned.

Appellant objected to a portion of the 8th paragraph of the court's charge, to wit: "There is, however, no definite space of time necessary

to intervene between the formed designed to kill and the actual killing; a single moment of time may be sufficient." This is a part of the definition of express malice and in the connection in which it appears in subdivision 8 of the court's charge it was not error. As an abstract proposition, it is correct and under the circumstances of this case it was applicable, because the parties being strangers and no previous grudge being shown, the killing occurring on the first meeting, the question of time would be a factor in forming the intent. The court in the connection in which this part of the definition was given informed the jury that they must believe beyond a reasonable doubt that the killing was the consummation of a previously formed design; that the design to kill was formed deliberately, with a sedate mind, that is at the time when the mind of the person killing was self-possessed and capable of contemplating the consequences of the act proposed to be done, etc.

This portion of the court's charge is objected to: "If from the evidence you believe the defendant killed the said Albert Miller, but further believe that at the time of so doing the deceased had made an attack upon him, which from the manner and character of it and the relative strength of the parties and the defendant's knowledge of the character and disposition of the deceased, caused him to have a reasonable expectation or fear of death or serious bodily injury, and that acting under such reasonable expectation or fear, the defendant killed the deceased, then you should acquit him." Appellant insists the charge is erroneous because it made defendant's right to an acquittal depend upon the knowledge and character and disposition of the deceased, there being no proof as to the character and disposition of the deceased and that the defendant had knowledge thereof, and furthermore it was not claimed that the deceased had attacked the defendant, but that the proof along this line shows that he was attacking him, and the effect of the charge was to put the burden on the defendant to show that he had been attacked. With reference to the last proposition, it occurs to us to make very little difference whether deceased had attacked or was then attacking appellant. If it be conceded that the testimony suggests self-defense at all as predicate on the attack, the deceased turning, and, according to his witnesses, going in the direction of appellant being an attack, it could not certainly injure appellant that the court told the jury if they believed appellant had made an attack; this was certainly not inconsistent with the idea that deceased was then making the attack. Certainly the jury were not misled as to this matter or as to appellant's rights in connection with the character of the attack. In regard to the other proposition, in support of his contention, appellant refers us to Wallace v. State, 97 S. W. Rep., 471; Hickey v. State, 76 S. W. Rep., 921, and Brady v. State, 65 S. W. Rep., 521, and some other cases. While it may be conceded that a charge of this character should not be given in the absence of some testimony suggesting the character of deceased and appellant's knowledge

thereof, the question presented here is, was, this charge, though in the absence of any testimony regarding deceased's character, such as to have injuriously affected appellant's rights. The question presents itself in common sense point of view: would the ordinary juror believe from this charge that there must be in evidence some testimony in regard to the character and disposition of the deceased, and some evidence of the relative strength of the parties, and knowledge thereof on the part of appellant before he could avail himself of the right of self-defense. To so hold, it occurs to us, would be to impute to the jurors a lack of ordinary intelligence, but beyond this, while the court gave a charge on self-defense in favor of appellant, both the one quoted above and the succeeding one coupled with threats to take life, we do not believe that the record, as here presented upon this point, entitled appellant to a charge on this subject at all. So far as the testimony of the State's witnesses are concerned, as to this homicide, it was an unprovoked murder. These witnesses show that appellant was the aggressor from start to finish; before the parties got on the street car, appellant asked Beulah Miller, who was a stranger to him, who was her man, and she replied that she did not have a man, that she was married, and appellant replied that he did not know whether she was a man or a woman; did not know whether she was married or not. After the respective parties got on the car appellant again renewed his insults, and deceased then went from the rear of the car where he was sitting to the front where the altercation was going on, and asked him not to insult that girl, that she was his sister-in-law, and appellant said that he would see him again; that after this he pulled his hat down over his eyes, and subsequently all the parties got off the car, and that as Beulah was getting off the car, appellant shoved her off and walked around to where deceased was, and stated, "You are the son-of-a-bitch that acted so flip," and as Albert Miller turned to see what he was saying, appellant shot him and he fell, and appellant shot at him twice more in rapid succession. Now, appellant's version is stronger than that of any other witness on his behalf, and he tells about the difficulty and homicide substantially, as follows: That as he came up in the park to where they were to take the car with his crowd, they passed the other crowd, and Beulah Miller cursed and "I said, 'Who was that cursed?' and she turned and said 'Hush up, nigger, no one is talking to you,' and she said, 'If you fool with me, I'll slap your head with this stick,' and I said 'I guess you won't,' and she said, 'I wouldn't have a nappy headed nigger like you. I've got a white man as my man,' and I said, 'I thought so. You are dressed in white,' and she said, 'Aren't you sorry your mother ain't got a white man?' and I said I've got no mother,' and then she said the same about my sister, and I told her I had no sister." That after they got on the car Beulah kept hurrahing him, but he said no more to her, and Albert came up to where they were with his left hand holding to the car and with his right hand with his knife down by his leg, and said,

"You black son-of-a-bitch, don't you interfere with this girl," and I said, "No, wait a minute and I'll tell you how it was," and he said, "No, you needn't tell me how it was, you black son-of-a-bitch, if you open your mouth again I will kill you," and "I said, 'That's all right. That's all right,' and I didn't say any more. Then he went to the back end of the car, and when we got to Houston and Soledad, I got off the car, and Sarah Jones gets off, and Mary Lou Courtney gets off, and so did Emmet Polk, and we stood on the sidewalk on Soledad, and Albert Miller,—he was on the back, he gets off and turns round and starts towards the Fulton market, and I was standing there"; that he was watching Miller because of what he said on the car; that Albert got about three steps from the car line and then turns around with his hand that way (showing position) and takes about three steps, and that he fired. Appellant was about three feet from him when he fired; he fired two more shots in rapid succession. At the second shot deceased was standing there, and after the second shot fired he was down. There is no claim that deceased said anything, or that appellant saw him have a knife in his hand. Appellant was asked the question: "You did not know whether he had a knife in his hand at that time or not?" and he answered in the negative. Now, on this character of testimony it is claimed appellant had a right to act in self-defense against an immediate attack then being made on him by deceased, which threatened his life or his person with serious bodily injury. It will be observed that no knife was found on deceased, much less an open knife in his hand after he was killed. Giving full stress to all that appellant says deceased did on that occasion, it occurs to us that the testimony suggesting self-defense, to say the most of it, is exceedingly weak; and to hold that (notwithstanding the court gave a charge on self-defense without threats, and one based on threats, because in the former reference was made to the relative strength of the parties and the character of deceased, when there was no testimony in the record on this subject) this case should be reversed, would be to put a premium on the assumed ignorance of the jury. We hold that while said charge was erroneous under the circumstances of this case, it was not of a character to injure or prejudice the rights of appellant. It does not occur to us that there is anything in the conduct of the district attorney as is complained of by appellant that would authorize a reversal of this case.

There being no errors in the record, the judgment is affirmed.

Brooks, Judge, absent.

*Affirmed.*

ON MOTION FOR REHEARING.

June 19, 1907.

HENDERSON, JUDGE.—This case was affirmed at a former day of this term, and now comes before us on motion for rehearing.

Appellant strenuously insists that the judgment of affirmance was

erroneous because of the fact that in the opinion of the court we discredited appellant's theory of self-defense, and among other things, he now brings before this court, in his motion for rehearing, affidavits re-enforcing that theory, and showing that deceased was actually armed with a knife at the time the homicide was committed. The affidavits show in effect that since the affirmance, and the publication thereof, in the press, it came to the attention of one W. W. Neunhoffer that he found an open knife at the scene of the homicide immediately thereafter, and delivered same to the officers of San Antonio, and that probably said knife had not been used in evidence. This affidavit is substantially as follows: That he came to San Antonio about the night of the 4th of September, 1906, from Comfort, together with C. C. Vann and Emil Rauch, and that they spent some time together looking over the city. About midnight they were going to the .Mahncke hotel and heard the shooting, which occasioned the homicide, and ran as fast as they could to the place. When they reached there some parties were moving the body of Albert Miller from the car line to the sidewalk or near the sidewalk. Miller was not dead at the time. At that time this witness saw a knife on the car track, one or more cars having passed over it and crushed the handle. The knife was a white-handled knife with the large blade open, and was not further than two feet from where the deceased fell. The witness picked the knife up, and a policeman standing by saw him, and walked up and looked at the knife, and the witness handed the knife to him; that the witness did not know any of the parties or any of the attorneys; did not know when the case was called for trial. The first that he knew of the action of the court was when he saw the notice in the paper that the case had been affirmed, and stating that defendant was unable to prove that the deceased had a knife at the time of the killing. Other affidavits show that this knife was deposited in the police department of San Antonio in an envelope containing this endorsement "William Taylor: This is a knife found and think was used in the killing scrape of Albert Miller, 9–4, 12:25 a. m. Knife found by Klockenkemper at the place of the killing." The affiant Phillips says that he turned the knife over to Chester H. Terrell, and the knife is the same one turned in on that night, which was handed in by Klockenkemper on the night of September 4, 1906. Klockenkemper in substance testified that he recognized the knife shown him as the one handed him at the place of the shooting, and that he turned it into headquarters. There are other affidavits showing the custody of said knife and identifying same. Benson's affidavit shows that he had been in the county jail since September 4, 1906; that he was without money, and was unable to procure any testimony in the case for his defense, and all the testimony in the case was procured by his attorneys; that he did not know W. W. Neunhoffer, J. S. Phillips, J. C. Evans, Emil Rauch, C. C. Vann, George Moore, and Martin Klockenemkemper, nor any of them, and did not know that

any of them knew anything about this case; that the testimony known by them was newly discovered so far as he was concerned, and his attorneys show that they used diligence, and they were unable to ascertain said testimony, and did not know of it until subsequent to the affirmance of this case, and until they were written to by Neunhoffer after the case was affirmed. Appellant insists that notwithstanding said evidence formed no part of the record on appeal, and is newly discovered evidence since the affirmance of the case, that still this court should consider same in some way; if in no other way, that it be sent down for a new trial before the district judge, upon a new motion embracing the newly discovered evidence, and he refers us to Turner v. State, 17 S. E. Rep., 752; State v. Way, 18 S. E. Rep., 677; State v. Young, 14 S. E. Rep., 66; State v. Sullivan, 19 S. E. Rep., 722. These were all cases from other States and doubtless based upon some statute peculiar to their jurisprudence. It is also argued that under the case of Moore v. State, 53 S. W. Rep., 862, that we are authorized to consider this newly discovered evidence as a part of the record on motion for rehearing. That case has no application to this character of case. We notice that the court in the opinion calls such procedure a motion for rehearing on the ground of newly discovered evidence; it should have been more appropriately termed a motion for a new trial, as it was made in the court below. Of course, in a motion for a new trial newly discovered evidence could be used under our system as defined by our statute. After an appeal has been perfected in this court, the transcript can only contain what transpired during the trial and subsequent thereto in connection with the case during the term of the court, and until the appeal is finally perfected thereafter, and although important evidence may have been discovered subsequent to the adjournment of the court, we know of no method by which same can be gotten into the record, as an integral part of the case to be considered on appeal. Of course, statement of facts and bills of exception are authorized to be filed within twenty days after the adjournment of court on a proper order to that effect, and these constitute a part of the record, and these may be corrected subsequently by the court before the completion of the record. There is no authority of which we are advised that would authorize this court to consider newly discovered evidence ascertained after the adjournment of the term of the court, much less after the record has been perfected, and the case brought into this court, and after the case has been tried on that record, and a motion of this character is presented for the first time on a motion for rehearing of the case. Such newly discovered evidence, however important, can only be used to invoke executive clemency.

In appellant's motion for rehearing he strenuously insists that this court was in error in holding that the court's charge on self-defense, though erroneous as considered by the court, was not such error as ought to reverse the case, and in that connection appellant has grouped the

facts suggesting that the theory of self-defense was much stronger than assumed by the court in its opinion. This charge of the court is contained in the original opinion, and appellant's criticism of same was that it made his right of self-defense depend on the relative strength of the parties and defendant's knowledge of the character and disposition of the deceased, when as appellant contended there was no evidence of the character and disposition of the deceased, much less any knowledge on the part of appellant of his character inasmuch as they were strangers to each other, and again, that the charge was predicated according to the language thereof upon the idea that the deceased had made an attack upon appellant, when as claimed by appellant he had not made an actual attack on him, but was about to make an attack or was in such attitude as caused appellant to believe that he was in the act of attacking him. We note, in disposing of these propositions of appellant, we said formerly: "If it be conceded that the testimony suggests self-defense at all as predicated on the attack, the deceased turning, and, according to his witnesses, going in the direction of appellant being an attack," which indicates that the court was not then impressed with the idea that self-defense was by any means strongly presented in the case. In fact, in the subsequent portion of the opinion we observed as follows: "Giving full stress to all appellant says deceased did on that occasion, it occurs to us that the testimony suggesting self-defense, to say the most of it, is exceedingly weak." As stated, appellant, in his motion for a rehearing challenges the court's declaration that self-defense was not a live issue in the case, and he urges even if it was in the case at all, it was the duty of the court to give an absolutely full and fair charge on the subject. Now, on appellant's first proposition, unquestionably the authorities show that where there is no evidence of the character and disposition on the part of the deceased known to appellant, that a charge on self-defense should not embrace this phase of the case, as such a charge is calculated to be misleading, and we believe we were in error in holding that the charge in this respect was not calculated or might not have been injurious to appellant. Moreover, the facts suggesting self-defense marshaled by appellant from the record show with much more cogency then originally occurred to us that the facts of the case authorized and required a charge on this subject, and that the charge as given was not accurately predicated on the facts of the case; that is, deceased may not from appellant's standpoint have been in the very act of making an attack on him, but he was in the attitude of advancing towards him for the purpose of making an actual attack. We believe that the court should have given a charge predicated both on an attack then being made, and on an attack then impending and about to be made. This, it seems, from a close inspection of the facts was necessary in order to adequately safeguard appellant's rights.

We also note that appellant insists that in the original opinion we left unnoticed an important error asigned by him, to wit: that the

court selected an important piece of testimony of the omission of witnesses to testify as to an important fact, and charged thereon, and that same was a charge on the weight of evidence. This assignment escaped us. This was the charge of the court excepted to: "The State has introduced the evidence of the witnesses Emmet Polk, Mary Lou Courtney and Sarah Jones taken at the inquest trial to impeach them by showing that they had given contradictory testimony on said inquest trial to that given now, and failed to testify at said inquest trial as now that deceased turned and advanced towards defendant at the time of the shooting. The object of introducing the impeaching testimony is to have you disbelieve and not to accept as true, and to refuse to give credence to the testimony of said Emmet Polk, Mary Lou Courtney, and Sarah Jones, given before you. Such evidence goes to both the discredit of the said witnesses and the falsity of the testimony impeached, and it is for you to say whether such impeached evidence, if any, does or does not absolutely disprove and falsify the evidence. of said witnesses given before you. The rule that a party introducing a witness shall not attack his testimony is so far modified as that any party when facts stated by the witness are injurious to his cause, may attack his testimony in any other manner, except by proving the bad character of the witness. For this reason the State was allowed to cross-examine the State's witness, Sarah Jones, and offer impeaching testimony, as herein stated, as it claimed surprise at said witness' testimony, claiming that she did not testify now as at the inquest trial and that the testimony now given was against the State and favorable to the defendant. You can only consider such impeaching evidence for impeachment purposes, that is for no other purpose than that of affecting the credibility of said witness, Sarah Jones, and the same as to the testimony of Mary Lou Courtney." Of course, impeaching testimony of this character goes both to the weight and credit of the impeached witness, which is in all cases introduced for the purpose of affecting the credibility of the witness proposed to be impeached; that is it is for the jury under all circumstances to determine the weight and credit which they shall give to the testimony of any witness attempted to be impeached. In this particular case it seems the court undertook to tell the jury the character of the contradictory statements, and among other things, he told them that the State had introduced evidence showing that said witness had failed to testify at the inquest trial that deceased turned and advanced towards defendant at the time of the shooting. That may be true, still it should have been left to the jury to determine whether said witnesses had failed to so testify at the inquest trial; and as framed, it occurs to us that the calling attention, in the way in which it was done, to this fact, and the declaration by the court that the witness had failed to so testify, could be used by the jury to discredit said witnesses, was a charge in this respect upon the weight of testimony, and we believe this error was of a serious character.

The rehearing is accordingly granted, and the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Brooks, Judge, dissents.